Hear ye, hear ye. This Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Susan F. Hutchinson presiding. Your Honor, the first case on the dock this morning is 2-22-0376. The people of the State of Illinois plaintiff's appellee, the Honorable Ramirez, defendant's appellant. On behalf of the appellant, Mr. Andrew B. Moore. On behalf of the appellee, Mr. Miles J. Keller. Good morning, counsel and visitors. Mr. Moore, if you're ready to proceed, you may do so. Let me get my papers organized here. Good morning, Your Honors, and may it please the Court. My name is Andrew T. Moore and I represent Andres Ramirez in this case. As you can see, he's got a lot of friends and family here to watch as well. Could you keep your voice up just a little bit so the recording is clear? Yes. Thank you. Just remind me if I get quiet. I tend to do that. This is a case of evidence. From the State's perspective, the evidence it presented at trial was sufficient to convict my client. From my client's perspective, he was unable to show his innocence because the prosecutor's willful disregard of discovery obligations in suppressing and ultimately destroying the very evidence that would allow him to do so. I'll be discussing how the suppression of 30 to 40 dash cam videos impacted Andres' trial. And hopefully I'll have time to discuss that no reasonable jury could have found that the State proved beyond reasonable doubt that the damage to the door was over $500, which was the very element that elevated a misdemeanor to a class-X felony that got a 55-year sentence. Do we know, or do you know, it's not what we know, but do you know what's on those dash cam videos? Nobody. The State doesn't know. We don't know. But case law says that in this situation we have to presume that it would have been helpful for Mr. Reyes. And this court held in People v. Ruffalo, where evidence is withheld from the defense in spite of a defense request for it, which it was requested here twice, the prosecution has abused its position so its conduct amounts to a suppression and a denial of due process occurs. At the onset of trial, like I said, Andres requested all dash cam videos associated with his arrest. Typically this is a routine request. It's not in every case with dash cams. But all he received was one video and a clip of a 25-minute video. The rest were destroyed. Ultimately, I will ask this court to dismiss all charges against Andres. And the alternative, this court could remand for a new trial or a hearing with instructions. So if the videos have been destroyed, what would the purpose of a new trial be? That's a very good question. I think the only way that this trial could proceed again is with some pretty significant evidence suppression, which may or may not, you know, remove all of the evidence that the state has. You say that the officers should have not been allowed to testify either because the dash cam videos could have been used for impeachment probably. Correct. Well, if there weren't dash cam videos and there hadn't been for the longest time, weren't the officers subject to cross-examination and to comparison of the consistency of their representations of what they saw or what they said they saw? Yeah, that's what happened in the past. The legislature has, in 2009, enacted some pretty clear legislation that says that these dash cams have to be preserved as evidence. And after Cladis, letting this person testify and subject to cross-examination just isn't sufficient anymore. We have these videos. These videos should be available to the defense, and they should be able to use those videos to cross-examine the officers and not just, you know, general questions of what could have happened. These videos show what did happen. So how did the state lose so much requested discoverable evidence? The answer is simple. It followed its own policies. The prosecutor laid it out in detail in this hearing. So let's talk about this policy. The first rule in the Kane County dash cam discovery policy is don't search for any dash cam videos. The second rule is turn over to the defense what the department has sent them. Excuse me, what the department has what? What? I couldn't hear that last two people. So they won't search for any videos, and they will give the defense only what the police department has sent them. The prosecution has no review of these videos. They leave it to the police department to vet their evidence in this situation. Well, then why wasn't a subpoena issued as well to the police department? If we know that's the issue, and apparently you're saying it was laid out perfectly, why wasn't there a subpoena to the police department? We didn't know this was the policy when the requests were made. We only know this policy two years after they were destroyed. But there was nothing preventing trial counsel from subpoenaing these records or going to the police department with a subpoena, was there? Well, you should not have to do that. The prosecution is obligated to turn these videos over. Well, that may be true, but it is the defense case that could be affected by this. And if you know, and defense counsel I'm sure knew that there were policies of police departments that these were dash cam videos were kept for certain periods of time pursuant to policy, which are public, a subpoena could have been issued, correct? It could have, but he requested these videos twice. The prosecution, we have to work together in the court. We're relying on the prosecution to provide us discoverable evidence. If we don't know that evidence exists, how are we going to search for it? Well, you just said that the legislature said that dash cam videos needed to be used, and so with that mandate from the legislature, you knew that there were probably, not you personally because you weren't the trial court or the trial counsel, but trial counsel knew that there should be dash cam videos. Yeah, and that's why they were requested. But the legislation also requires these videos to be saved for the duration of this case, not just 90 days as they are in Kane County. If they're a part of an arrest, if an officer activates his lights and an arrest is made, that dash cam video has to be saved for the duration of the case until a court orders otherwise. So we can, from the defense position, it's kind of chaotic at first. We're requesting discovery. We're getting some things. We got one video. We got some surveillance videos. Defense counsel didn't even know that these videos existed until two years after they were destroyed. That's a significant problem. That's a complete breakdown of the discovery process. The court didn't know that these videos existed. The defense didn't know these videos existed, but the state did. And nobody had read the law? Apparently. Nobody's read the court rules, the law. Including the defense attorney. I, with all due respect, Your Honor, I've got to disagree with that. But we have to rely on the discovery process. Where does it say you have to rely on discovery? You have the subpoena power. Defense has subpoena power. You subpoena witnesses. They subpoena information. They subpoena records. And they go to the source of the records. Yeah, and we also get, we, if the prosecution is obligated by law, by statute, by court rules to do this, that's something that the defense should be able to rely on. We shouldn't have to go out and subpoena everything. If the state didn't want to submit these videos, they should have objected to the discovery request. That's what should have happened. They did not do that. And then they waited two years to even admit that these videos existed. Counsel, you've got your due process argument hinges on whether there's bad faith, correct? Not necessarily, Your Honor. But that's more or less what Trombettos, Trombettos says. Let me see here. I'm not remembering that case. That's the Duke, California. It was like breath evidence, DUI related. Yeah. So that case is. So just to follow up and you can respond as you see fit. What evidence of bad faith is there? I don't condone what occurred. But apparently this was done in the ordinary course and without an intent, at least insofar as the record shows, to do something personal to this case, to this defendant or, you know, to protect particular cops. It was just simply that they all showed up at a shooting. Apparently they all had their dash cams going. Some came later, some earlier. Some were pointed the right way, I'm sure. Some were pointed the wrong way, I'm sure. And then, you know, according to the policy, 90 days later it all got whatever the word is, purged. Yeah. How do these facts show a due process violation? I just want to separate the due process violation from the discovery violation. Well, going back to Ruffalo, if the state willfully disregards a discovery request, that's bad faith. The state set up this policy, or Kane County, I can't, I'm not accusing all counties, because from my understanding every other county around Kane County doesn't do this. They have access, the prosecutor has access to these videos. But also if a prosecutor sets up a policy that's clearly in violation of court rules that apply, they're doing this in every case. This isn't just our case. This is their policy. We don't know how many cases have been affected by this. That's why this case is so serious. I represent Andres. That's my concern. But also you can't, the white elephant in the room is since 2009 they were required to keep these. Obviously they're not doing it by their own policy. And how many cases is this affected by? This is a pretty high profile case. It's a shooting at a police officer. We've got a lot of people coming in to help that police officer. But what's the underlying current in this case is that every bit of evidence that the state gave to the defense only helps the state's case. They didn't do anything to protect the defendant in this case. As late as 2014, this court has said that despite a discovery request, the defendant must still show bad faith. Are you saying this policy by King County is bad faith? Yes. There's no other way around it. It's a clear violation of discovery rules. That doesn't mean it's bad faith, the violation of discovery rules. Bad faith means it's an intentional either destruction or loss or something beyond just a policy that we're not going to look for them. I'm going to disagree with that for a couple of reasons. First, most of the bad faith discussion in these cases, like Youngblood, is officer actions. That is a different situation than this because officers don't, they're not officers of the court. They're not, they don't have a legal education. They're not responsible for all of this. The prosecutor, at the most basic level, should understand things like discovery. If they set in place a policy that's in clear defiance of the legislation, case law, court rules, how is that not in bad faith, honestly? Well, I guess it's a little bit like if I don't look for it, then I don't have any responsibility to say I withheld it. Those are two different things. Bad faith appears to be withholding, whereas I'm not going to look for it just appears to be standard, their standard operating procedure for purposes of presenting cases. But also willfully not looking for something is a decision. They know if these videos aren't downloaded or whatever by the individual police officer driving that police car, it's gone in 90 days. If they have a policy that doesn't take that into consideration and lets all this stuff get destroyed, there's no way that that cannot be bad faith. Well, how can the state's attorney control what the police departments do? They have judgment over their policies, but the watch guard, the state can have a login to this. These videos are easy to find. You just search date and time. You can search by the officer. You can search by the case numbers. I mean, this isn't we live in the age of technology. It's not like they're going to a warehouse in the 50s looking for a fingerprint. This is like evidence that is at their fingertips. They could have this very easily, but they choose not to do it. They say it's too burdensome, but every other county around them is doing it. When they say it's too burdensome, have you compared case numbers per assistant or case numbers per office to show that it is not burdensome? I don't have that information. That's not in the record. May I ask what is in the record as far as King County State's Attorney's Office policy when they get the notice that the trial counsel's office sent twice? Well, I guess one was from the PD's office and the other was from private counsel. Correct. Is there anything in the record, and I apologize if there is and I am not aware of it, as far as what they do when they receive a request for information, which is that in their hands? In this specific instance with dash cam videos, they presented to the court that they don't look for them and they wait for the police to give them to them. The problem with that is two things. The police are only going to give them videos that capture the crime. There's multitudes of discoverable things that did not capture the crime. Secondly, the police officer testified that they don't get discovery requests. They don't know that this has been requested. They don't know what's requested. The prosecutor has to control that. And if the court doesn't mind, I'd like to wrap up here unless you have more questions. Mike, you can proceed for a short time and then I'll ask if my colleagues have any other questions. Okay. Your Honors, as the saying goes, desperate times calls for desperate measures. This one case impacted my client. But as I said, this is a countywide policy that impacts a lot of cases. Dismissal of charges is really the only applicable remedy given the severity of this suppression. The state doesn't even know how many videos there are. They don't know what's on them. If you go through Brady, every single element of Brady is met just because of presumptions because the state did so poorly in this case. Brady relates to the withholding of exculpatory evidence. We don't know that there is any exculpatory evidence. We have to presume that it's exculpatory. I don't believe that's the bottom line of the court. And the Illinois v. Fisher said, we have never held or suggested that the existence of pendant discovery request eliminates the necessity of showing bad faith on the part of the police. So if you didn't, according to this record, there wasn't even a subpoena to the police. So how do we know that they exercised bad faith? I'm arguing bad faith on the prosecution. Well, but the prosecution is not totally in control of the police. The prosecution is presumed to understand all of the evidence that the police has. They have that presumption. That's what the court rules dictate to them. So they have to work with the police to facilitate some kind of process to get this evidence. They can't just throw their hands up and say, I'm not going to do anything. These court rules have been in place, I couldn't even find when they were enacted, that they have to work with police to get this evidence. If you're going to do reply, and you don't have to make that decision right now, I'd like to know the page numbers in the record where this was laid out by the state's attorney. If you have them now, that's fine. If you don't. I don't have all of the pages, but the police officer policy of what videos they save is on page 166. That one I know about. And the prosecution starts laying out its process on 186. Okay. All right, Justice Kennedy, do you have any questions? I just wanted you to address the property damage estimate. Why is not the estimate of 682 as the repair cost sufficient evidence that damage was in excess of $500? In this case, we have a lay opinion estimate. And my argument is that a lay opinion estimate needs to be supported by the record. What our estimate is for is for a door that's of a different material. And there's all these ancillary charges, hardware, accessories. There's a custom door size. We don't know how this door was measured. We don't know how any of these costs came from. In Cunningham, this court made a, you know, a big deal about its expert testimony and can establish this. But in the least, if you have a lay opinion, my argument is that it should at least be supported by the record, which this estimate is not supported by the record. If the door damage was custom, and I don't mean to, you know, trivialize this aspect of the case, but if it was custom, then why not consider, why would it be improper to consider the replacement with a custom door? We don't know how that ‑‑ we don't know why it's a custom door. It's a custom door size. So presumably ‑‑ But if we take a look at the, you know, facts in the light most favorable to the, you know, winner below, then couldn't we assume the jury found, maybe based on the age of the house or to whatever extent they considered it, that the door there was not a standard door, therefore it needed a custom replacement? I'm concerned about that. I would suggest that you look at the evidence in the pictures of this door. This is just a normal door. It's not a ‑‑ I have, but what I don't know is that standard for current doors available on the market. The house, you know, again, I can't really ‑‑ I could guess the age of the house. Right. It certainly wasn't a new house. Correct. And I don't know that, you know, the ‑‑ it accommodated the standard of what's now a standard front door. So I guess that's one issue. I guess I would ‑‑ I have, and I also want to ‑‑ you can answer that one, and then behind it is I am concerned that I would need to find bad faith before I can find a due process violation. I understand your arguments better after what I've heard today. But the trial court recognized a discovery violation and sanctioned. Why is that an abuse of discretion? He should, in that specific instance, so there's two, there's kind of two discovery issues here. There's the McHugh video, which was clipped down to 19 seconds. That's what the defense filed their motion over, because they didn't know about these 30 to 40 videos until the state's closing arguments in that hearing. So the whole hearing was kind of based on the McHugh video. Clattis says that if one of these videos are suppressed, the officer can't testify to the contents of the video. The judge said, well, I'm not going to stop him from testifying about what he saw, but Clattis says that they shouldn't be allowed to do that. And going back to your first issue, you know, all the questions about the door, these are all things the state could have put in front of the jury. You have all these questions because it is so mysterious. It's just one, it's one page of a four-page estimate. We don't know what's on those other pages. Maybe the first page was, oh, $10 to fill this little stuff with wood putty and re-stain it. Like, maybe that's the repair. That's well under $500. So the questions that you were asking actually kind of get to my point, which is how can a reasonable jury find that these charges are supported when there's not any of that information in the record? There was no cross-examination consistent with the type of discussion you're talking about now? That's correct. Defense counsel at trial did not really push this issue, but reasonable doubt arguments aren't waived on appeals, so there's nothing. I'm not talking about a waiver. I'm talking about having the questions that Justice Mullen's asking and you say could have been asked. They simply weren't asked, were they? No. Thank you. All right. Do you want to summarize, please? With that, Your Honors, I would ask this Court to, with the first issue, the discovery issue, either dismiss Andres' charges or remand for a hearing or a new trial. And with the reasonable doubt argument regarding the door, we just ask that this Court reduce that to a misdemeanor and issue the six-month sentence. Thank you. You'll have an opportunity to reply if you so choose. I think you're leaving your pen. Yes, I am. And that's actually the guy who has the pen. Mr. Kelleher. Yes, you need to bring that down. Thank you. Sure. Good morning, Your Honors and Counsel. Myles Kelleher on behalf of the people. May it please the Court. This case does not involve a Brady violation. This case is controlled by the Supreme Court. It is controlled by the United States Supreme Court's decision in Arizona v. Youngblood. And here there was no due process violation because the purged dash cam videos were merely potentially useful. And there was no bad faith on the part of the police or the state. Well, Mr. Kelleher, he seems to be making a – Mr. Moore seems to be making an argument that the policy itself, where the state isn't going to even inquire about it, is bad faith, almost a per se bad faith. Well, the policy of the Aurora Police Department was to preserve videos of evidentiary quality or germane to the case. And in the discovery request, the discovery request asked for any and all squad car police station and police videos and audio recordings of the defendant or of the police or witnesses to the events. So it was broader than what the police department policy was. The discovery request was broader than the policy of the police, true? Perhaps because the police were only going to preserve evidence or video germane to the case, correct? Yes. So the defense request was broader than what the police felt they were required or what their policy dictated they should preserve. It may have been, but ultimately the – But it was, wasn't it? It was broader. Yes, but – Because it wanted just, you know, anything where the defendant was there, anything where a witness was there, or anything where a cop was present, whether it was germane or not, evidentiary or not. Yes, but – And so is that a problem? Is there a reason why they can't have that? Well, yes, because – What is that reason? Because if you – It has to be a reasonable – It's up to the state's attorney to say, we can't provide that. It has to be – Isn't it? It has to be a reasonable request. Yes. And it has to be for – And I can't right now think of what would be unreasonable about it without knowing more. Now, if it was going to be, you know, tons of data and ridiculously time-consuming to get, then I understand. What that would require is for someone at the state's attorney's office to take a look at this request and figure out how they were going to fulfill it. And in order to do that, they'd have to know what the policy was at the police department. And then they'd have to figure out what has to be done to preserve this before the 90 days goes by. And if it's burdensome, then I assume they bring it to the attention of the court and or the defense attorney and work something out. What is the problem with any of this? Well – And if your belief is that there's no bad faith violation here, because at that point the King County state's attorney's office – or the relevant state's attorney's office hadn't figured out that there's a thing called computers. And that people get rid of – they store a lot of data and that people tend to purge them because it's inconvenient and expensive to keep it. Then my question to you is, the next case, six months or a year from now, will that then be bad faith by the state's attorney's office or the police department? Will that then be bad faith? Because now, apparently, this is the first time it's been considered by anyone that this data might be purged. In every case, the police have to make decisions about what to preserve and what not to preserve. They do. But when the state's attorney gets a notice that is, as far as I know, proper, that they need something for discovery, isn't it incumbent upon them to make sure that's fulfilled and not purged? That's really the issue. Yes, it is. But in this case, the state's attorney did act in good faith. Did what? Because they – first of all, they rely on the police. And obviously, the police have to act in good faith, too. The police – they need to understand, don't they, now that they know that the police will only keep what they view as germane and evidentiary unless it will be purged within 90 days. Now, don't they have more of a responsibility? If I could just give an example. Say there's a murder in a house and the police are investigating. They're trained to recover evidence that they deem relevant. It may be of a weapon, bloodstains, perhaps DNA, maybe any other artifact. And they might not keep it. But if the state's attorney gets a request for something that's broader than what the police – I understand. Then doesn't the state's attorney have an affirmative obligation to fulfill the request or say it's burdensome, it's irrelevant, it's oppressive, this was brought for an improper purpose? There's all kinds of experience the court and the legal system has with dealing with discovery requests that are inappropriate. But none of that was done. I'm trying to answer that question. And I was just going to say, in the house example, the police wouldn't recover every piece of furniture in the house because of significance. And just analogizing that to – And that wouldn't be a discovery violation, would it? The discovery violation happens when the defense says, hey, I want the high chair from the kitchen. But here the police complied and so did the state. Because if you look at the facts of this case, they investigated the defense, they gathered the evidence they deemed relevant, the ballistic evidence, they took photos, and they sought any video evidence that they deemed relevant. First of all, they recovered the – If they didn't even know that there were 30 or 40 different vehicles there that might have dash cams, how did they investigate that? Well, if you look at the Brady School video, at the time of the shooting, there's only one police vehicle in that video, and that's Officer Zeninga's. So obviously they're going to recover that dash cam video, and they did. Apparently the second vehicle that arrives is the Officer McHugh's van. They recover the relevant portion from that video. But if you look at the Brady School video, it takes some time before all these other police vehicles start converging on the scene. And by that time, defendants are already in custody. This was a very relatively quick – The defense is that it's another shooter. He might be in the vicinity. You're right. That's all speculation, though. Let me redirect to the question I have, which is under Rule 412F, the state should ensure that a flow of information is maintained between the various investigative personnel in its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged. Doesn't that mean that the duty is on the state, regardless of what the police policies might be? The state acted in good faith to turn over all the evidence that they were provided by the police. And here, in addition, just to show how diligent the police were, not only did they turn over the preserved dash cam videos that they thought were relevant, they went around the neighborhood. They got the video from Brady School. They got the video from 225 High Street. So you can't just look at what the police didn't do. You have to look at what they did do. And their actions indicate that they were diligently trying to find any video evidence of either the shooting or the arrest. And they were able to find two dash cam videos from police vehicles and also two surveillance videos from buildings in the area. So this is not a case where the police were negligent and failed to, you know, properly investigate the crime. They acted diligently. They obtained four videos. That's a lot of evidence against the defendant. And there was compelling evidence of his guilt, even without the videos. And that's something this court has to keep in mind. And I just want to point out that- Let me ask one question. The Aurora police officer, who has some responsibility for these videos, apparently testified that where a crime is captured, they will save the videos because that is what they're supposed to investigate. Did they, in this case, even look beyond McHugh's and Zeninga's dash cams to- or is there any evidence that they did to determine if this crime was captured in any other place? Yeah, presumably they did. And if they had- Say the Brady School video indicated children under a police vehicle at the time of the shooting. Then, of course, we would ask, well, where's the dash cam video from that video that was on- from that vehicle? But that's not the case here. The case here- The Brady School video indicates that there were no other police vehicles in the vicinity at the time of the shooting. Most of them came later. There was an incident that was later, and that was someone coming out the side door after the shooting. So that also might be an issue in this particular case. Yes, and if that was caught on video, that would be certainly relevant. And it was caught on video. It was caught on Officer McHugh's video, and that's why they preserved that one. So that's evidence that the police preserved the videos that they deemed relevant, that either captured the shooting itself or defendant coming down the stairs and- So one question about that. So there was testimony that everything is automatically uploaded to WatchGuard. Detective Qdebik testified that the dash cam videos were automatically uploaded. So do we know whether these 20-plus dash cam videos were actually uploaded and then destroyed? Because it sounds like you're saying that the police would never have uploaded some of these. Yeah, I believe the way it works is that if the police believe that a video has evidentiary quality or is germane to the case, then they would take steps to download that video. And that's exactly what they did for the two vehicles that they believed had evidentiary quality. Those were from Officer Zeninga's dash cam and also Officer McHugh's dash cam. But those that they don't deem have evidentiary quality will automatically be purged after 90 days. Even if there's a request for the discovery from the defense? I mean, that's what they're trying to do. Your Honor, the request was for- It was broader than what the police would ordinarily keep, right? But it wasn't for every dash cam vehicle that had no evidentiary value. It was specifically- No, it wasn't. It was broader than what the police would have ordinarily kept. And it seems to me that if the state doesn't move to ensure that this is preserved, then there is a violation. But I'm hearing you say the police decide, not the defense attorney, not the state's attorney. Right. The police decide what they will keep, and then they will give what they keep. And that's the rule, Judge, and don't worry about that. Your Honor, just like any crime scene, the police have to make the decisions, which DNA evidence to collect, which photos to take. And they can't- Well, these are collected. The dash cam videos were collected. And whether they're uploaded or not is apparently an open question. But it's collected by the devices on the dash cam. Your Honor, it's different. They're automatically collected because that's the way the system works. They weren't collected because they thought that they had evidentiary value. We're familiar with how computers work. They're basically only collected for evidentiary purposes when they're downloaded. And the Youngblood decision- And that could have happened a few days later, which was after the request came in. Yes, but the Youngblood decision specifically talks about this. And it says, you know, the court is unwilling to impose on the State an undifferentiated and absolute duty to preserve all material that might be of conceivably evidentiary significance in a particular prosecution. And for the defense request not to come in before 90 days, I'd say, well, you know, they can't keep everything. But Youngblood still applies to this case, Your Honor, because this is a case where at most all you can say is potentially useful. I don't think Youngblood was considering that a request would come in before evidence was purged and that it would just be purged anyway because somebody decided it wasn't worth keeping. I think Youngblood would have contemplated that it would have been reviewed and turned over unless it was irrelevant or burdensome or what have you. In this case, there was no bad faith because there was no reason for the police, the Aurora Police Department, or the Kane County State's Attorney's Office to believe that these other dash cam videos that were automatically saved by the system had any evidentiary value. The ones that did have evidentiary value, they saved. Here's what the request was. Any and all in-squad police station and police video and audio recordings of the defendant or of the police or of any witness to any events involving or relating to defendant occurring on or about the date of his arrest in a non-proprietary format which is capable of viewing a DVD, CD, or VHS player if you find one. Furthermore, it says that the state will be ordered to use diligent good faith efforts to secure for the defense any material or information which would be discoverable under these rules and in the possession, if in the possession of the state, but which is in the possession or control of other governmental personnel. If that was too big a request, the state should have said something. They did it. The state had no basis to believe that there was any other videos with evidentiary value. But according to Mr. Moy, they didn't even look. They didn't even look at it. So how did they know? Just like the state can't go out to every crime scene and investigate and look for... Well, they do. They do for the most part, but that's not the point we're talking about here. We're talking about this request, which was on paper, which could have been objected to and narrowed down, but it wasn't. If that's the policy, then in any case, any time there's an offense in Aurora or Elgin, you could subpoena every police car that was out on the street, maybe even the state troopers because they were on the highway, maybe a car 10 miles away might have saw a defendant going to the scene or something. There has to be a reasonable limit. If that was too burdensome or oppressive or intrusive or done for an improper purpose, the subpoena would be quashed. But yes, someone could subpoena them. Is that a problem? I mean, it assumes good faith on the part of the person using the court process, right? We've relied on that for a bit. The trial court looked at this. The trial court considered the situation with Officer McHugh's dash cam video. Trial court found it in its discretion, found a discovery violation, but specifically found no due process violation. And we're here today to talk about whether or not there was a due process violation. And we're here today to determine if there was one notwithstanding what the trial court said. And your time is up, so you need to – I'm going to ask my colleagues. You can summarize this issue, and then I'll ask my colleagues if they have any other questions. Yes. I would just sum up by saying, you know, under Youngblood, you know, you have to show bad faith on the part of the police or the state. Here, when you look at the totality of the circumstances, they acted reasonable. They collected the evidence that was reasonable in this case, an abundance of evidence, I submit. And there was overwhelming evidence of this person's guilt even without this video evidence. So the state acted properly here. The police acted reasonable here. And under Youngblood, which controls, I submit that this court should affirm defendant's conviction. Justice Kennedy, do you have any questions? Justice Mullen, any other questions? Yes, about the door. Is there a case where the victim-slash-owner of a criminal damage testifies to an estimate? Yes. Because, you know, the Chambers case by Justice Hudson was a case of first impression that said in the criminal context that, and there were several cases where the car repair shop owner or whatever came in and, you know, a paid bill is easier because the payment is evidence of the reasonableness of the fee. Estimates are a little different than that because nobody's paid yet, right? But in the cases I saw, it was, as far as I could say, all of them were where the vendor testified to the estimate.  And it wasn't the victim saying, I went out and got, and then Chambers is of that ilk. Chambers, by Justice Hudson, case of first impression, there the vendor came and testified to their estimate, and the court said that's fine. We assume that an experienced vendor in this trade knows what it would cost. But I guess my question to you is, are we within Chambers where the victim goes and gets an estimate? And that's, you know, other than knowing where they went, I don't know that we know that much more because the person estimating didn't come before the court. And I guess, you know, the armed violence hangs on this. There was certainly this, you know, the door was damaged. The jury found there was some evidence, I guess, of a sign and some other items, but the state didn't pursue proof up on any of that. So are we within Chambers? Do you contend we are within Chambers when the victim testifies to the estimate instead of the vendor? Well, the, first of all, Chambers, in Chambers they said a written estimate from a car repair shop was sufficient. Right, but the car repair shop owner testified, didn't they? Right. So it wasn't just the estimate. There was a person there to say, here's what I estimated, here's why, here's my experience. Yes, but it didn't say it was absolutely required. No, it didn't. And the jury can use its common sense and life experiences. And here, you know, many people probably shopped at Menards. That's not exactly a high-end home improvement store. Did they take judicial notice of that? I'm saying that some of the jurors could use their experience. And when you get an estimate, and sure, it might seem like, you know, just a bullet damage, what's the big deal? But to the homeowner, that's a big deal, especially when they worked it out. And he had the right to be made whole, and he got an estimate from Menards. But the issue here isn't the rights of the victim. The issue is the sufficiency of the proof by the state on the violence, you know, upon which a 55-year sentence hangs. Yes, that's absolutely correct, Your Honor. But the estimate from Menards did show, you know, the base price was 407. The custom door size price was 126. Those two alone get you over 500. And it's reasonable because, you know, jurors can use their life experiences. Home repairs can be expensive, even for a door. And in this case, apparently it had to be custom-made because, you know, doors come in all shapes and sizes. And it's, again, you have to look at the evidence in the light most favorable to the prosecution. And here a rational charge of fact could have found beyond a reasonable doubt that the damage to the house exceeded $500. Now, you know, the defense wants this court to look at the evidence in the light most favorable to the defense. Well, maybe they could have, you know, patched it up somehow cheaper, or maybe he could have gone to some other store and gotten a door cheaper somewhere else. But that's not the standard of review. It has to be reviewed in the light most favorable to the prosecution. And here there is ample evidence. The estimate from Menards was a reasonable evidence of the cost of repairing this door. And, you know, that's something that in addition to the testimony of Hector Rivera, who was the owner of the residence, the jury could look at that evidence and rationally find that the total damage exceeded $500. And the defense attorney did not cross-examine that estimate or anybody about that estimate, did they? No. He or she? No, Your Honor. And the estimate doesn't even include, you know, certain things like taxes or, you know, installation. So this is just the price of the door. And, you know, the whole question about the accessories, I submit that, you know, when you're replacing a door, you want it properly functioning. That means you might have to replace the sill or the weather stripping or basically the, you know, the victim here's house was damaged by the gunshots, and he did everything appropriate, went to Menards, got an estimate, and that was provided for the jury along with his testimony. And, you know, viewing the evidence again in the light most favorable to the prosecution, a rational juror could have found the damage exceeded $500 in this case. Thank you, Mr. Kelleher. Thank you. Mr. Moore. Just briefly touching upon the door issue as it's become to be known, there's no testimony that replacement of this door was required. So I'll leave it at that. And he went to Menards and got an estimate. Nobody went to his house to determine what needed to be done. So my argument is that... So if his door was damaged and he wanted that door to be replaced, he was not entitled to replacement? He had to just take a patch with some putty? Is that what you're saying? Well, the law says damage $500 or over. Okay. But you can't... If a vacuum hose breaks in my engine, I'm not going to buy a new engine. I'm going to replace that. You might. Yeah. If an expert tells me that I need a new engine because of that, I'll get a new engine. If they tell me that I need to replace the vacuum hose for $25, that's what I would do. You're not disputing that the door was actually replaced? I don't know if it was replaced or not. All we have is this estimate. Moving to the other issue, it can... The discovery issue can be summarized by the second sentence in the state's... Second sentence, second paragraphs of the state's reply. At trial, the people introduced video evidence that they deemed evidence. That's not what the discovery process is. Discovery process is also to protect the defendant. And counsel says that these... It's speculative. It's speculative because of actions of the state. Last time I was in front of Justice Kennedy, we talked about Wilford Brimley. Well, this time I'm going to bring quantum physics into it. We basically have Schrodinger's evidence here. We don't know if it's... It could be 100% exculpatory. It could be nothing. We don't know what it is. But if you look at the first hearing in this case, 250 Jefferson and Aurora has been a known Latin Kings associated house for 30-plus years. This neighborhood is heavily dominated by Latin Kings. What do they wear? A black hooded sweatshirt and tan pants. So if you have a shooting, where's the shooter going to go? He's going to run away. Simultaneously, you have all of these police cars. If there's 30 or 40 videos made, presumably pretty much every angle is taken. They could have captured numerous people dressed exactly like my client. And it's important to consider he wasn't identified by his face. He was identified by his clothing and his body type. How many people in this neighborhood are heavyset and are wearing black hooded sweatshirts and tan pants? There's a black hooded sweatshirt inside of 250 Jefferson. You've got a guy, if you watch the video closely, there's somebody sneaking out the side of the door and running away the opposite way just as my client's being arrested. He could have taken that sweatshirt off and run that way. Oh, maybe a cop car coming from that direction would have seen him. But we do have a picture of that. Of what? Of that person sneaking out the door that wasn't introduced because it was prohibited. It's on the Brady video. We don't know that that's the person. I know, but you're saying that there was another person. We see that. You've seen the video. I've seen the video. The jury didn't see the video. The jury saw the Brady video. All right. And defense counsel discussed this. Defense counsel made the arguments that he made the exact arguments that these videos would have helped. He didn't make a separate argument, and now I'm arguing that these videos would have helped him at trial. He was hampered by not having these evidence because he's limited to a very, there's no periphery, very straight-sided, they're only going to save evidence that captures the crime. Well, if he's innocent, that's not going to capture anybody fleeing. That's not going to. And also, just remember, the state's saying he exited the side door of 250 Jefferson. My client's saying he was trying to get into it. There's nothing, all the videos start with him standing there. McHugh and Zuniga testified they saw him exiting that door. Well, that testimony is impossible because he was standing at that door for 16 seconds prior to McHugh's arrival. So these videos would have been, should have been given to the defense, and it would have provided a very good opportunity for him to find witnesses, find alternate suspects, or even show that my client was actually innocent. And these videos were not saved. They were never watched, so we have to presume that they were favorable in one of these ways. Therefore, the state acted in bad faith in not doing anything to protect these videos. Thank you, Your Honor, unless you have any other questions. Thank you very much, Mr. Moore. Thank you both for your arguments this morning. We will take this matter under advisement. We will issue a decision.